UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

THOMAS SUCHOCKI,

      Plaintiff,

   v.

SERGEANT CHRIS GILCREST,
PAULSBORO POLICE DEPARTMENT,
and CITY OF PAULSBORO,

      Defendants.

HONORABLE JOSEPH E. IRENAS

CIVIL ACTION NO. 11-4626
(JEI/JS)

**OPINION**

**APPEARANCES:**

ZANE & LOZUKE
By:  Raymond J. Zane, Esq.
131 Delaware Street
Woodbury, New Jersey 08096
    Counsel for Plaintiff

POWELL, BIRCHMEIER & POWELL
By:  James R. Birchmeier, Esq.
1891 State Highway 50
P.O. Box 582
Tuckahoe, New Jersey 08250
    Counsel for Defendants

**Irenas**, Senior District Judge:

This is a deprivation of rights case arising under 42

U.S.C. § 1983.[1]  Plaintiff Thomas Suchocki ("Suchocki") asserts

that Defendants Sergeant Chris Gilcrest ("Gilcrest"), the

Paulsboro Police Department, and the City of Paulsboro

---

[1] The Court exercises federal question subject matter jurisdiction pursuant to
28 U.S.C. § 1331.

1

("Paulsboro") violated his civil rights during a traffic stop and subsequent arrest.  Presently before the Court is Defendants' Motion for Summary Judgment.  For the reasons stated below, this Motion will be granted.

## I.

On May 28, 2010, Thomas Suchocki was traveling south in his pickup truck on Route 44 ("Broad Street") in Paulsboro, New Jersey.  (Second Am. Compl. ¶ 8)  Sometime just before 3:30 p.m., Suchocki's truck approached the intersection of Broad and Delaware Streets.  (T. Suchocki Dep. at 24-25)  As he approached, Suchocki stopped his vehicle at the red traffic signal.[2]  (*Id.* at 32:24-33:2)  Upon stopping at the light, Suchocki observed Sergeant Chris Gilcrest of the Paulsboro Police Department escorting schoolchildren across the intersection from Suchocki's right to left, while simultaneously directing traffic.  (*Id.* at 28:16-20)  As he waited at the light, Suchocki's pickup truck windows were up, the radio on, and the air conditioner running.  (*Id.* at 34:16-21)

---

[2] Suchocki described approaching the intersection and coming to a stop at the red light behind an SUV.  (Suchocki Dep. at 33:6-17)  Gilcrest testified that Suchocki was the "one vehicle in front of me," and that no other SUV was moving through the intersection during the events in question.  (C. Gilcrest Dep. at 42:5-6, May 8, 2012)  Resolution of this factual dispute is unnecessary to decide the instant motion.

Once the traffic light changed to green, the vehicle in
front of Suchocki made a left turn and Suchocki began to advance
through the intersection. (*Id.* at 35:18-21)  As Suchocki
accelerated from his stopped position, Gilcrest motioned for
Suchocki to stop, and Suchocki stopped before entering into the
crosswalk of the intersection.[3]  (*Id.* at 36:2-37:9; C. Gilcrest
Dep. at 42:11, May 8, 2012)  As he stopped, Suchocki rolled his
driver-side window down. (Suchocki Dep. at 37:5-11)  After a
brief moment without any further direction from Gilcrest,
Suchocki began proceeding through the intersection once again.
(Suchocki Dep. at 37:13-15; Gilcrest Dep. at 53:11-13, May 8,
2012)  Upon seeing Suchocki moving again, Gilcrest yelled for
Suchocki to stop his vehicle, which had now proceeded out into
the intersection.  (Gilcrest Dep. at 54:17, May 8, 2012;
Suchocki Dep. at 37:13-15)

During the course of these two stops, Suchocki and Gilcrest
dispute Gilcrest's actions while he stood in the intersection.
In Suchocki's recollection, Gilcrest was not crossing any
schoolchildren when Gilcrest gave the two commands to stop.
(Suchocki Dep. at 32:13-15)  On the other hand, Gilcrest
testified that schoolchildren were entering the intersection

---

[3] Gilcrest testified that Suchocki's vehicle was further out into the
intersection at this point, but the precise location of Suchocki's vehicle at
this point is irrelevant for determining the instant motion.

when he first asked Suchocki to stop, (Gilcrest Dep. at 49:4-6, May 8, 2012), and Gilcrest remained in the middle of the street as the children reached safety when he gave Suchocki the second directive to stop, (*Id.* at 55:20-21).

Next, the undisputed record demonstrates that in response to Gilcrest's second directive to stop, Suchocki stopped his vehicle in the intersection and began an exchange with Gilcrest through the driver-side window. (Suchocki Dep. at 38:16-24; Gilcrest Dep. at 63:8-21, May 8, 2012) While Suchocki and Gilcrest dispute the substance of their exchange, they both agree that the discussion concluded with Gilcrest directing Suchocki to pull over, and Suchocki did so. (Suchocki Dep. at 38:22-24; Gilcrest Dep. at 63:20-22, May 8, 2012)

As Suchocki pulled over to the side, a second conversation between the two ensued. (Suchocki Dep. at 41-42; Gilcrest Dep. at 64-65, May 8, 2012) While the record contains some conflicts regarding the substance of this conversation,[4] the undisputed record ultimately demonstrates that Gilcrest requested Suchocki's license, registration, and insurance information. (Suchocki Dep. at 47:2-9; Gilcrest Dep. at 63-65, May 8, 2012) While Suchocki retrieved his driving credentials, he attempted

---

[4] For example, Gilcrest indicated that Suchocki yelled that Gilcrest "need[ed] to learn how to do [his] fucking job." (Gilcrest Dep. at 63:17-18, May 8, 2012) Suchocki disputed that he used any expletives, but ultimately conceded that he told Gilcrest "I don't think you know how to do your job," after Gilcrest pulled him over. (Suchocki Dep. at 42-43)

4

to place two phone calls - one to his attorney and one to his office.  (Suchocki Dep. at 52:17-22, 53:7-24; Gilcrest Dep. at 64-65, May 8, 2012)  The parties dispute whether Gilcrest took Suchocki's telephone following these two calls; while Suchocki testified that he handed the phone to Gilcrest as he completed his calls, (Suchocki Dep. at 54:1-3), Gilcrest denied ever taking the telephone from Suchocki as part of the traffic stop, (C. Gilcrest Dep. at 10:5-9, June 29, 2012)

Following Suchocki's handover of his credentials, Suchocki ended up outside of his vehicle, ultimately under arrest. Suchocki and Gilcrest provide different accounts of precisely when and how Suchocki ended up outside of his truck.  For example, Gilcrest testified that he handed Suchocki a traffic citation for failure to obey a traffic officer's signal while Suchocki remained seated in his vehicle.  (Gilcrest Dep. at 3:24-4:2, June 29, 2012)  Following the handover of the citation, Gilcrest explained that "I was walking back to complete my crossing guard post, at which time he got out of his vehicle, told me to lock him — as his words, 'lock him the fuck up,'" which prevented Gilcrest from returning to his traffic post duties.  (*Id*. at 4:2-8)  Once Gilcrest was interacting with Suchocki out of his truck, arguing with him and preventing him from returning to directing traffic, Gilcrest felt he had no choice but to arrest Suchocki.  (*Id*. at 4:7-8, 5:20-23)

On the other hand, Suchocki testified that Gilcrest took his credentials and then asked Suchocki to step out of the truck and walk around to the rear of the vehicle. (Suchocki Dep. at 55:1-5) Once there, Suchocki told Gilcrest he wanted to see a supervisor, and waited while Gilcrest crossed a group of children until he returned to finish writing out the traffic ticket. (*Id.* at 55-56) As Gilcrest wrote out a citation, Suchocki explained:

> He [Gilcrest] told me that he didn't like my attitude. He was trying to do his job, and he would lock me up, and that's when I just said, if you are going to lock me up, and I believe I said if you are going to lock me the fuck up, lock me up. He said, you are under arrest. Put your hands behind your back, and he put handcuffs on me.

(*Id.* at 57:4-10) Thus, while Suchocki and Gilcrest provide divergent accounts as to why Suchocki got out of his vehicle, once Suchocki was out of his truck, there is no dispute that he and Gilcrest argued in the street prior to Suchocki's arrest.

Following Suchocki's arrest, Gilcrest called for backup and a second officer responded to escort Suchocki to the Paulsboro police station. (*Id.* at 59:23-60:1) While was processed over the course of an hour, Suchocki was fingerprinted, had his picture taken, and refused to answer any questions from Gilcrest. (*Id.* at 65:24-65:12, 64:8-65:12, 66:6-9) Though he overheard that his attorney had arrived at the police station

and saw him on a television monitor, Suchocki was not permitted to speak with his attorney until his processing was complete. (*Id.* at 64:15-65:12) Ultimately, Suchocki was charged with two offenses: (1) harassment, in violation of N.J.S.A. 2C:33-4C and (2) obstruction the administration of law, in violation of N.J.S.A. 2C:29-1A. (Gilcrest Police Rep. at 2-3) After litigation in Logan Township Municipal Court spanning from mid-June, 2010, through January 4, 2012, the criminal charges against Suchocki were dismissed. (Suchocki Dep. at 74:2-4)

This case began on May 31, 2011, when Suchocki filed a Complaint in the Gloucester County Superior Court, Civil Division, separate from his ongoing criminal matters in Logan Township. (Dkt. No. 1, Ex. A at 1) The Defendants removed the case to this Court on August 10, 2011, and Suchocki filed an Amended Complaint on January 10, 2012. Suchocki filed a Second Amended Complaint on March 8, 2012. Following a motion to dismiss, Logan Township was terminated as a party, and as a result of Paulsboro's motion for judgment on the pleadings, Count Four of the Second Amended Complaint was dismissed on May 7, 2012.[5] At the close of discovery, the remaining Defendants —

---

[5] For further details regarding the dismissal of this claim and the termination of Logan Township, see *Suchocki v. Gilcrist*, No. 11-cv-4626 (JEI/JS), 2012 WL 1600124, at *2 (D.N.J. May 7, 2012).

Gilcrest, Paulsboro, and the Paulsboro Police Department — now
move for summary judgment under Rule 56(a).

## II.

"The court shall grant summary judgment if the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a). In deciding a motion for summary judgment, the
court must construe all facts and inferences in the light most
favorable to the nonmoving party. *See Boyle v. Cnty. of
Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v.
Del. River Port Auth. of Pa. and N.J.*, 16 F.3d 1346, 1349 (3d
Cir. 1994)). The moving party bears the burden of establishing
that no genuine issue of material fact remains. *See Celotex
Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is
material only if it will affect the outcome of a lawsuit under
the applicable law, and a dispute of a material fact is genuine
if the evidence is such that a reasonable fact finder could
return a verdict for the nonmoving party. *See Anderson v.
Liberty Lobby, Inc.*, 477 U.S. 249, 252 (1986). The non-moving
party must present "more than a scintilla of evidence showing
that there is a genuine issue for trial." *Woloszyn v. Cnty. of
Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). The court's role in
deciding the merits of a summary judgment motion is to determine

whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter. *Anderson*, 477 U.S. at 249.

### III.

The Court understands Suchocki's Second Amended Complaint to contain three remaining claims, each pursuant to 42 U.S.C. § 1983 for violations of Suchocki's constitutional rights. The Court discerns that Suchocki's first count alleges a claim of false arrest against Gilcrest. The second count alleges that Gilcrest and the Paulsboro Police Department deprived Suchocki of his right to counsel following Suchocki's arrest on May 28, 2010. The third count alleges that Suchocki, during the course of his arrest, was the victim of Gilcrest's inadequate training by Paulsboro and the Paulsboro Police Department.

The Defendants initially argue that they are entitled to summary judgment because they have not committed constitutional violations giving rise to liability. The Court first addresses whether Gilcrest's actions give rise to liability and then turns to the municipal Defendants.

### A.

Section 1983 provides, in relevant part:

> Every [person who, under color of any statute,
> ordinance, regulation, custom, or usage of any
> State . . . subjects or causes to be subjected,
> any citizen of the United States . . . to the
> deprivation of any rights, privileges, or
> immunities secured by the Constitution and
> laws, shall be liable to the party injured in
> an action at law.

42 U.S.C. § 1983. To establish a valid claim under § 1983, a plaintiff must (1) demonstrate that he has been deprived of a right, privilege, or immunity secured by the Constitution or laws of the United States and (2) that the person who deprived him of that right acted under color of state law. *Groman v. Twp. of Manalpan*, 47 F.3d 628, 633 (3d Cir. 1995). The Court first addresses Suchocki's claim against Gilcrest in count one for false arrest and next turns to Suchocki's claim against Gilcrest for a violation of his right to counsel in count two.

## 1.

Count one alleges that Suchocki is entitled to relief under § 1983 for Gilcrest's violation of his Fourth and Fifth Amendment rights following Suchocki's arrest.[6] The Court

---

[6] Suchocki's Second Amended Complaint vaguely references the violation of his Fifth and Fourteenth Amendment rights as a result of the alleged false arrest. (Second Am. Compl. ¶¶ 26, 33) As a matter of law, any relief for false arrest falls under the protections of the Fourth Amendment. *See Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995) ("Broadly stated, the Fourth Amendment prohibits a police officer from arresting a citizen except upon probable cause."); *see also Basile v. Township of Smith*, 752 F.Supp.2d 643, 651 (W.D. Pa. 2010) (citing *Groman v. Township of Manalapan*, 47 F.3d 628, 636 (3d Cir. 1995)) ("A claim for false arrest under [§] 1983 originates from the Fourth Amendment guarantee against unreasonable

understands this to be a claim for false arrest arising from the events of May 28, 2010. "To prove a claim for false arrest, a plaintiff must prove two elements: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *Islam v. City of Bridgeton*, 804 F.Supp.2d 190, 197 (D.N.J. 2011). There is no dispute that Gilcrest was on duty as a police officer, in full duty uniform, and acting in his official capacity when he arrested Suchocki on May 28, 2010. (*See*, *e.g.*, Gilcrest Police Rep. at 1) Thus, Gilcrest's liability turns on whether Gilcrest had probable cause to arrest Suchocki.

Probable cause exists "when, based on the factual circumstances, a prudent person would believe that a particular suspect has committed or is committing an offense." *Islam*, 804 F.Supp.2d at 197 (citing *Sharrar v. Felsing*, 128 F.3d 810, 817-18 (3d Cir. 1997)). "Probable cause exists where the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant a reasonable person to believe that an offense has been or is being committed by the person to be arrested." *U.S. v. Cruz*, 910 F.2d 1072, 1076 (3d Cir. 1990) (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)). These circumstances must exist "at the moment the

---

seizures."). To the extent Plaintiff asserts a Fifth Amendment claim stemming from the alleged false arrest, it will be dismissed.

arrest was made," as a constitutionally valid arrest requires probable cause. *Beck v. Ohio*, 379 U.S. 89, 91 (1964).

Here, there is no dispute that Suchocki was initially stopped by Gilcrest in a traffic stop at the intersection of Broad and Delaware Streets, for which Suchocki received a citation for "Failure to Obey Police Officer's Signal." (Gilcrest Police Rep. at 2; Suchocki Dep. at 38:16-24) Ultimately, as a result of certain circumstances during the traffic stop, Suchocki was arrested and charged with "Harassment," a violation of N.J.S.A. 2C:33-4, and "Obstructing administration of law or other governmental function," a violation of N.J.S.A. 2C:29-1. (Gilcrest Police Rep. at 2; T. Suchocki Dep. at 64:8-65:12; Second Am. Compl. at ¶¶ 34) Better stated, the dispositive question for Gilcrest's motion is whether the undisputed record demonstrates that Gilcrest had probable cause to arrest Suchocki for these two charges at the time of his arrest.

Under New Jersey law, a violation of N.J.S.A. 2C:29-1 is a disorderly persons offense, which occurs when "he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently

12

unlawful act." N.J.S.A. 2C:29-1. Similarly, harassment is generally a disorderly persons offense. N.J.S.A. 2C:33-4. An individual is liable for committing harassment when he:

> a. Makes, or causes to be made, a communication or communications anonymously or at extremely inconvenient hours, or in offensively coarse language, or any other manner likely to cause annoyance or alarm;
>
> b. Subjects another to striking, kicking, shoving, or other offensive touching, or threatens to do so; or
>
> c. Engages in any other course of alarming conduct or of repeatedly committed acts with purpose to alarm or seriously annoy such other person.

*Id.*

While there is some dispute regarding the exact events that prompted Suchocki to get out of his vehicle during the course of his interaction with Gilcrest,[7] viewing the events immediately before Suchocki's arrest in the light most favorable to Suchocki demonstrate that Gilcrest had probable cause for Suchocki's arrest. At the time of the arrest, Gilcrest was the sole

---

[7] Suchocki testified in his deposition that during the course of the traffic stop, Gilcrest asked him to exit the vehicle, at which point Suchocki got out of his truck and walked to the back of the truck where he waited for Gilcrest to finish writing his traffic citation. (Suchocki Dep. at 55:1-5) Gilcrest testified that Suchocki was still in his truck when Gilcrest finished writing the traffic citation, and then after Gilcrest gave Suchocki the summons, Suchocki "got out of his vehicle, told me to lock him – as his words, 'lock him the fuck up.'" (Gilcrest Dep. at 4:13-4, June 29, 2012) Whether Suchocki was directed to exit the vehicle or got out of his own accord is irrelevant for purposes of determining whether Gilcrest had probable cause to arrest Suchocki under these circumstances, as the basis for probable cause arose after Suchocki was already out of the vehicle.

officer responsible for directing traffic at the intersection of
Broad and Delaware streets. (Gilcrest Dep. at 5:6-13, June 29,
2012; Suchocki Dep. at 57:11-13) While Gilcrest wrote out a
traffic citation for Suchocki, Suchocki was outside of his
vehicle, arguing with Gilcrest and asking for Gilcrest's
supervisor. (Suchocki Dep. at 56:25-57:13) As Suchocki
explained, "I finally had enough, and I said if you are going to
lock me the fuck up, lock me up." (Suchocki Dep. at 59:21-22)
With Suchocki out of his truck and cursing at Gilcrest, Gilcrest
explained at his deposition that, at that point, "[Suchocki's]
now interfering with me trying to do [my job as crossing guard],
so I then placed him under arrest." (Gilcrest Dep. at 5:21-23,
June 29, 2012)

In other words, Suchocki directed expletives at Gilcrest
and argued with him, an unlawful act under N.J.S.A. 2C:33-4(c).
By doing so after getting out of his vehicle, Suchocki's actions
required Gilcrest's attention and thereby prevented Gilcrest
from returning to his traffic control duties. Given that
Suchocki's cursing and arguments prevented Gilcrest from
returning to his crossing guard post, the undisputed facts
demonstrate that Gilcrest reasonably believed that Suchocki was
committing the offenses of harassment and obstructing Gilcrest's
ability to carry out his crossing guard duties. While these
charges were ultimately dismissed, (Suchocki Dep. at 74:2-4),

the Court is required to determine probable cause based on the officer's knowledge at the moment of the arrest, *Beck*, 379 U.S. at 91. The record demonstrates that Gilcrest arrested Suchocki as a result of his cursing, argumentative behavior, and demand that Gilcrest "lock [him] up," all of which prevented Gilcrest from returning to his traffic posting. These behaviors provide adequate grounds for determining that Suchocki may have violated the harassment and obstruction statutes, which therefore constitutes probable cause for arresting Suchocki on these charges. The Court therefore will grant Gilcrest's Motion for Summary Judgment on the claim of false arrest.

## 2.

The second count of Suchocki's Second Amended Complaint seeks relief for a violation of Suchocki's right to confer with counsel after the May 28th arrest.[8] (Second Am. Compl. ¶¶ 32-33) Under *Miranda v. Arizona*, 384 U.S. 436 (1966), statements obtained during a custodial interrogation, where an individual

---

[8] Suchocki's claim arises under the Fourth, Fifth, and Fourteenth Amendments of the Constitution. (Second Am. Compl. ¶ 33) Suchocki does not make this claim under the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." Sixth Amendment protections only attach when a prosecution commences, for example, at the point of an "adversary judicial criminal proceeding-whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Rothgery v. Gillespie Cnty.*, 554 U.S. 191, 198 (2008) (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)). As Suchocki's claim stems from his post-arrest processing for charges that were ultimately dismissed, no adversary proceeding had yet begun and therefore Sixth Amendment protections would not apply to his claim.

is not informed of their right to counsel, violate the Fifth Amendment, and such statements would be inadmissible at a subsequent criminal trial. *Id.* at 477-79. This constitutional protection, however, does not give rise to a colorable § 1983 claim. *See Callaway v. N.J. State Police Troop A*, 12-cv-5477 (RBK), 2013 WL 1431668, at *5 (D.N.J. Apr. 9, 2013).

"[T]he 'right to counsel' during custodial interrogation recognized in [*Miranda*] is merely a procedural safeguard, and not a substantive right." *Giuffre v. Bissell*, 31 F.3d 1241, 1256 (3d Cir. 1994). As such, "failing to follow *Miranda* procedures triggers the prophylactic protection of the exclusion of evidence, but does not violate any substantive Fifth Amendment right such that a cause of action for money damages under § 1983 is created." *Callaway*, 2013 WL 1431668, at *5 (quoting *Jones v. Cannon*, 174 F.3d 1271, 1291 (11th Cir. 1999)). There is, therefore, no "free-standing Fifth Amendment claim for denial of the right to counsel during questioning." *Callaway*, 2013 WL 1431668, at *5 (citing *James v. York Cnty. Police Dep't*, 160 Fed. Appx. 126, 133 (3d Cir. 2005) (per curiam)); *Story v. Atlantic City Police Dep't*, 11-cv-5340 (RBK), 2012 WL 4507168, at *5 (D.N.J. Sept. 27, 2012). Here, the record contains no evidence about Suchocki's *Miranda* rights and whether Gilcrest properly apprised Suchocki of the right to counsel while in custody. However, such evidence is ultimately irrelevant

16

because § 1983 does not permit the recovery of money damages for a violation, even if one had occurred.[9]  The Court therefore grants summary judgment in Gilcrest's favor on Suchocki's claim for a violation of his right to counsel.

## B.

Suchocki names both the City of Paulsboro and the Paulsboro Police Department as defendants in this matter.  As a matter of law, however, the Police Department is not a proper Defendant in this case.  For purposes of § 1983 liability, the Third Circuit "treat[s] the municipality and its police department as a single entity."  *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 25 n.4 (3d Cir. 1997); *see also Trafton v. City of Woodbury*, 799 F.Supp.2d 417, 430 (D.N.J. 2011).  Such a conclusion is reinforced by New Jersey law, which explains that a police force is "an executive and enforcement function of municipal government."  N.J.S.A. 40A:14-118.  Accordingly, Defendant Paulsboro Police Department will be granted summary judgment in its favor.

---

[9] Moreover, the criminal charges leveled against Suchocki were ultimately dismissed, meaning that any violation of his right to counsel could not be used against him in violation of his Fifth Amendment rights.  (Suchocki Dep. at 74:2-4)

**C.**

The Court now turns to Suchocki's claims against Paulsboro. Specifically, Suchocki alleges two § 1983 claims in count three of his Second Amended Complaint: (1) failure to train and (2) failure to discipline its police officers.  Each of these claims will be addressed in turn.

**1.**

In cases arising under § 1983, municipalities cannot be held liable on a *respondeat superior* theory.  *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978).  Rather, municipalities are only liable "for their own illegal acts."  *Connick v. Thompson*, 131 S.Ct. 1350, 1359 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)).

To bring a claim of failure to train under § 1983, a plaintiff must "(1) identify the deficiency in training; (2) prove that the deficiency caused the alleged constitutional violation; and (3) prove that the failure to remedy the deficiency constituted deliberate indifference on the part of the municipality."  *Lapella v. City of Atlantic City*, No. 10-cv-2454 (JBS/JS), 2012 WL 2952411, at *6 (D.N.J. July 18, 2012) (citing *Malignaggi v. Cnty. of Gloucester*, 855 F.Supp. 74, 77 (D.N.J. 1994)); *see also City of Canton v. Harris*, 489 U.S. 378, 391 (1989).  To satisfy the causation element, there must be an

"affirmative link" between the training inadequacies of the municipality and the constitutional violation committed by the police officer. *Lapella*, 2012 WL 2952411 at *6-7 (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 824-25 n.8 (1985)).

Here, Suchocki cannot demonstrate a constitutional injury sufficient to satisfying the causation element of a failure to train claim. Suchocki argues that Gilcrest's training record demonstrates a total absence of training regarding law enforcement officer demeanor, as well as shortcomings in legal training. (Pls. Br. in Opp'n at 36; Celeste Rep. at 46) This assertion, while perhaps satisfying the first element of the failure to train test, does not provide an affirmative link to a colorable constitutional injury necessary for liability. As described *supra*, Gilcrest had probable cause to arrest Suchocki for harassment and obstructing the administration of law. Because of that determination, Suchocki cannot demonstrate that a failure in training caused a deprivation of his civil rights. The Court must therefore grant Paulsboro's Motion for Summary Judgment on Suchocki's failure to train claim.

## 2.

A municipality may be liable under § 1983 for a failure to supervise or discipline its officers where some pattern of similar constitutional violations exists, and the municipality

has shown a policy or custom of "deliberate indifference to the rights of people with whom the [employee] has come into contact." *Gretzula v. Camden Cnty. Technical Sch. Bd. of Educ.*, -- F.Supp.2d --, No. 12-cv-7357 (JBS/JS), 2013 WL 4430824, at *8 (D.N.J. Aug. 14, 2013) (quoting *Carswell v. Borough of Homestead*, 381 F.3d 235, 244 (3d Cir. 2004)). Suchocki alleges that the omission of disciplinary policies, specifically the Paulsboro Police Chief's failure to take action to prevent future injuries, constitutes "deliberate indifference" and therefore precludes a grant of summary judgment for Paulsboro. (Pl's Br. in Opp'n at 38) In support, Suchocki cites the sixteen reported actions reflected in Gilcrest's disciplinary record as evidence suggesting "a pattern of Sergeant Gilcrest escalating the emotions of the [complaining] parties." (*Id.*)

However, this statistical data alone "may not justify a jury's finding that a municipal policy or custom authorizes or condones the unconstitutional acts of police officers." *Merman v. City of Camden*, 824 F.Supp.2d 581, 591 (D.N.J. 2010) (citing *Strauss v. City of Chicago*, 760 F.2d 765, 768–69 (7th Cir. 1985). As the *Merman* and *Strauss* courts recognized, there are any number of reasons that an individual might make a civilian complaint about a police officer. *See*, *e.g.*, *Merman*, 824 F.Supp.2d at 591. While Suchocki provides an expert report that synthesizes anecdotes from Gilcrest's co-workers regarding his

"poor demeanor" around citizens, (Celeste Rep. at 50-55), these quotations are not actually linked to any of the citizen complaints lodged against Gilcrest. Thus, there is no evidentiary support suggesting Gilcrest's prior civilian complaints deserved discipline and that those prior instances were analogous to any alleged deprivation of Suchocki's constitutional rights. Thus, Suchocki's claim against Paulsboro for failure to supervise Gilcrest rests solely on the number of civilian complaints filed against Gilcrest, which alone cannot sustain municipal liability under *Merman*. The Court will therefore grant Paulsboro's Motion for Summary Judgment on Suchocki's § 1983 failure to supervise claim.

## IV.

Based on the foregoing, the Court will grant summary judgment in favor of the Defendants. An appropriate Order accompanies this Opinion.

Date: 12-30-13

    /s/ Joseph E. Irenas
    **Joseph E. Irenas, S.U.S.D.J.**